Robert J. Cummins, d/b/a Bob  :
Cummins Construction Company  :
          :
          :
    v.      :
          :
          :
Bradford Sanitary Authority,  : No. 1000 C.D. 2019
      Appellant :
          :
Robert J. Cummins, d/b/a  :
Bob Cummins Construction Company, :
      Appellant :
          :
    v.      :
          : No. 1009 C.D. 2019
Bradford Sanitary Authority  : Submitted: May 15, 2020

BEFORE: HONORABLE P. KEVIN BROBSON, Judge
     HONORABLE ANNE E. COVEY, Judge
     HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE COVEY       FILED: June 8, 2020

    Bradford Sanitary Authority (Authority) appeals from the McKean County Common Pleas Court's (trial court) June 27, 2019 order denying its Motion for Post-Trial Relief (Authority Motion). Robert J. Cummins d/b/a Bob Cummins Construction Company (Cummins) also appeals from the trial court's June 27, 2019 order denying in part Cummins' Motion to Mold the Verdict for Interest, Penalty Interest and Attorney's Fees (Cummins Motion). The Authority presents four issues for this Court's review: (1) whether the trial court erred by finding that the Authority's Contract 2013-2 General Construction (Contract) was ambiguous, thereby allowing Cummins to introduce expert testimony; (2) whether the trial court

erred by finding that the Authority acted in bad faith; (3) whether the trial court erred by allowing the jury to decide Cummins' change order claims; and (4) whether the trial court erred by denying the Authority a new trial. Cummins presents two issues for this Court's review: (1) whether the trial court erred by denying Cummins penalty interest; and (2) whether the trial court abused its discretion by denying Cummins the balance of its attorney's fees. After review, we reverse the trial court's June 27, 2019 order denying the Authority's Motion, and vacate the trial court's June 27, 2019 order denying, in part, Cummins' Motion.

**Background**

The Authority owns and operates a wastewater treatment plant (Plant) in Foster Township, McKean County, that serves the City of Bradford and other nearby communities. When the Authority sought to conduct Wastewater Treatment Plan Upgrades (Project), it retained Gannett Fleming, Inc. (GF) to provide engineering and construction management services. *See* Reproduced Record (R.R.) at 1152a. Part of the Project required the construction of concrete tanks containing sequencing batch reactors (SBR)[1] to treat sewage and other wastewater at the Plant.

In 2013, the Authority issued an Invitation for Bids (IFB) from contractors for the Project that included the Contract and documents attached thereto

---

[1] "A[n SBR] is a type of bioreactor used to remove sludge and other organic matter from sewage in order to produce clean water for discharge." Amici Br. at 3. More specifically,

> [a]n SBR sequentially conducts each phase of the treatment of wastewater in a single tank: filling the tank with untreated wastewater (fill stage); reacting the untreated wastewater with diffused oxygen (aeration stage); allowing the reacted wastewater to settle so solids can fall to the bottom of the tank (settle stage); decanting the treated water out of the tank (decant stage).

Authority Br. at 11-12.

and incorporated therein (Contract Documents).[2]  The IFB included a Project Manual containing, *inter alia*, Instructions to Bidders and the Contract.[3]  Section 11393 of the Project Manual contained the specifications for the SBR and its ancillary structures, equipment and controls (SBR Specifications).  *See* R.R. at 148a-171a.  The Authority described that GF's design and the SBR Specifications were based on

> a continuous-flow SBR manufactured by ABJ Sanitaire . . . with four separate SBRs installed in 4 adjacent, contiguous tanks (Tanks 1-4) (thereby increasing the total volume of wastewater that could be treated).  Tanks 1 and 2 shared a common 'influent box' where wastewater entered the SBR, as did Tanks 3 and 4.  'Influent' is the untreated wastewater, so the wastewater first entered the influent box.  Each tank had its own manual gate in the influent box, and as designed the influent was to continuously and intentionally flow over the gate, which generally remained in the open position (unless a tank was being cleaned or repaired).  Influent entered the influent boxes through 20-inch ductile iron influent pipes capable of supplying 13.88 million gallons per day ('MGD') of wastewater.

Authority Br. at 12 (record citations omitted); *see also* R.R. at 152a, 196a-198a. GF's drawings, included in the Contract Documents, were of the above-described system.  Notwithstanding, because the Project was competitively bid, in Section 1.05

---

[2] "'The statutory mandate of competitive bidding is grounded in sound public policy.' *Philips Bro[s.] Elec[.] Contractors, Inc. v. P[a.] T[pk.] Comm[']n,* 960 A.2d 941, 945 (Pa. Cmwlth. 2008).  '[I]t is the taxpaying citizen who provides the necessary funds and whose interest must be protected.' *Yohe* [*v. City of Lower Burrell,*] 208 A.2d [847,] 850 [(Pa. 1965)]." *Hanisco v. Twp. of Warminster*, 41 A.3d 116, 123 (Pa. Cmwlth. 2012).

The first round of bids were received in June 2013.  However, the Project was rebid, and rebids were received in September 2013.  *See* R.R. at 632a-633a.

[3] The Contract consisted of the documents set forth in Article 15.01 of the parties' Agreement, *see* R.R. at 56a, and in Article 1.01.A.16 of the General Conditions (*see* R.R. at 317a), which included, *inter alia*: Instructions to Bidders, Agreement, General Conditions, Supplementary Conditions, Specifications, GF's Contract Drawings, Addenda, Agreement Exhibits including the Notice to Proceed and Cummins' Bid, plus any Written Amendments, Work Change Directives and Change Orders to be delivered on or after the Contract's effective date (collectively, the Contract Documents).

of the SBR Specifications, the Authority designated as "ACCEPTABLE MANUFACTURERS":

> A.    ABJ Sanitaire
>
> B.    Ashbrook Simon Hartley [(Ashbrook)]
>
> C.    Aqua Aerobics

R.R. at 152a.

Although the SBR Specifications authorized bidders to select Ashbrook or Aqua Aerobics as acceptable manufacturers, Section 11.01.B of the Instructions to Bidders (Section 11.01.B.3) stated:

> 1.    Products named on the Contract Drawings, if any, and products of manufacturers named first throughout the Project Manual[,] constitute [GF's] design.
>
> 2.    Products of named manufacturers, other than the first named manufacturer, appearing throughout the Project Manual or on the Contract Drawings are accepted as equal; however, the requirements of [Section] 6.03 of the General Conditions regarding 'equipment' and 'machinery' shall apply.
>
> 3.    If products of manufacturers other than those named first differ from those named first in the Project Manual or on the [Contract] Drawings to the extent that their proper incorporation into the [work required by the Contract Document (]Work[)[4]] requires changes to the structural, piping, mechanical, electrical, instrumentation, or any

---

[4] Section 1.01.A.42 of the General Conditions (DEFINED TERMS) defined "Work" as:

> The entire completed construction, or the various separately identifiable parts thereof required to be provided under the Contract Documents. Work includes and is the result of performing or providing all labor, services, and documentation necessary to produce such construction, and furnishing, installing, and incorporating all materials and equipment into such construction, all as required by the Contract Documents.

R.R. at 320a.

4

other changes of whatsoever nature, the [c]ontractor shall be responsible for such changes.

Section 11.01.B (R.R. at 137a).

Because it received a better deal on the SBR system from Ashbrook than from ABJ Sanitaire, Cummins proposed to install an Ashbrook SBR, which is a true sequencing (rather than continuous-flow) SBR system, in which only one of the four SBR tanks fills at a time. Cummins proposed to install automatic gates to control influent flow into a tank, rather than manual gates or a separate pipe with a valve into each tank. Cummins was the winning bidder.

On February 12, 2014, the Authority and Cummins executed the Contract. On March 11, 2014, GF issued Cummins a Notice to Proceed. *See* R.R. at 284a. Pursuant to Section 1330 of the Project Manual (Submittal Procedures), *see* R.R. at 1672a-1675a, Cummins submitted the Ashbrook product data and shop drawings reflecting changes Ashbrook proposed to GF's design to incorporate the Ashbrook SBR. GF determined, based on Cummins' and Ashbrook's assurances during the bid and submittal processes, that the proposed Ashbrook SBR would meet the SBR Specifications with regard to hydraulic and organic capacity, in particular, that it could handle up to 13.88 MGD of influent. After several meetings and some changes, GF marked Cummins' final SBR shop drawings "Reviewed," R.R. at 640a, 3405a, and Cummins installed the Ashbrook SBR at the Plant.[5]

After the SBR was put into operation in 2015, the parties discovered an influent overflow problem with the SBR system, which Cummins claimed was due to the 20-inch influent piping being too small to accommodate the Ashbrook system's sequencing. The Authority/GF disputed that the piping size was the cause, and claimed that the overflow resulted from the automatic gates not controlling the flow,

---

[5] Cummins argues that GF reviewed *and approved* the drawings, but GF only marked them "Reviewed." R.R. at 640a, 3405a.

and that a different piping configuration was necessary to accommodate the Ashbrook SBR. Notwithstanding, neither Cummins nor Ashbrook had previously identified to GF a need to increase the size of the 20-inch influent pipes in GF's design or to reconfigure the piping for the Ashbrook SBR to deliver the contractual 13.88 MGD of wastewater.[6] The parties disagreed on the solution and the cost thereof.

On or about December 22, 2015, GF certified that the Project was substantially complete – with the exception of the SBRs and two other items. *See* R.R. at 273a-282a. However, because the Authority believed Cummins' performance was contrary to the Contract's provisions relative to the SBRs and other Project components, it denied certain of Cummins' change orders and withheld Cummins' final payment to correct or complete Cummins' work.

On March 17, 2016, Cummins filed a complaint in the trial court against the Authority, alleging that the Authority breached the Contract, and sought recovery of the retainage ($259,920.00), and costs it incurred to perform extra work required by the change orders ($393,523.00), plus interest, penalty interest and attorney's fees. Cummins amended its complaint on June 29, 2016. On July 28, 2016, the Authority

---

[6] Cummins encouraged Ashbrook to submit a Technical Proposal to GF to be included as an Acceptable Manufacturer for the Project. *See* R.R. at 706a, 4211a-4215a. In Ashbrook's July 23, 2013 Technical Proposal, it represented:

> Ashbrook proposes the elimination of the pre-react walls, as they are not required for the Ashbrook SBR process proposed for this [P]roject. Ashbrook will require the use of [four] (4) 20" electrically actuated plug valves to feed/isolate each SBR basin in lieu of the influent distribution splitter box and the [] weir gates shown in . . . the [P]roject plans.

R.R. at 705a. Without GF's input, Ashbrook changed its proposal to install automated influent control gates in lieu of GF's designed manual gates and, in advance of the rebids, Ashbrook sent its modified Technical Proposal to the potential bidders. *See* R.R. at 3530a-3535a. As a result, the above language was not included in Cummins' rebid, or in its submittal after it won the Contract. *See* R.R. at 706a, 4211a-4213a.

6

filed its answer and new matter to Cummins' amended complaint, and counterclaimed regarding various alleged defective or incomplete work, as well as liquidated damages for delay. On August 29, 2016, Cummins filed its reply to the Authority's new matter and counterclaim. On November 14, 2016, the trial court ordered the parties to complete discovery by January 30, 2017. The parties conducted extensive discovery and exchanged expert reports.

On October 17, 2017, the parties filed competing motions for partial summary judgment. The Authority asked the trial court to interpret, as a matter of law, that the Contract made Cummins solely responsible for SBR overflows and barred certain of Cummins' requested change orders. *See* R.R. at 7a-563a. Cummins requested that the trial court enter judgment in its favor, as a matter of law, on the Authority's SBR-related claims and counterclaims. *See* R.R. at 564a-1052a. The parties opposed one another's motions. *See* R.R. at 1227a-2554a. On February 28, 2018, the trial court denied both partial summary judgment motions, *see* R.R. at 2555a-2560a, stating: "[I]t is apparent that the facts alleged in each cannot both be simultaneously true, and there is much doubt in the record about what facts exist." R.R. at 2556a.

On October 31, 2017, Cummins filed a second amended complaint to include additional change order claims. *See* R.R. at 1053a-1149a. On November 8, 2017, the Authority filed an answer and new matter to Cummins' second amended complaint, and asserted counterclaims against Cummins for costs the Authority incurred as a result of Cummins' purported failure to correct SBR deficiencies that allowed untreated wastewater to overflow the SBR gates. *See* R.R. at 1150a-1226a.

On February 15, 2019, the Authority filed two motions in limine in the trial court. In the first, the Authority requested the trial court to preclude Cummins' expert James D. Hannon (Hannon) of Hannon Engineering, P.C. from expressing opinions regarding Cummins' and GF's contractual responsibilities that are contrary

7

to the Contract's express terms. *See* R.R. at 2604a-2676a. In the second, the Authority sought to have the trial court find Cummins responsible for identifying and making changes necessary to incorporate the Ashbrook SBR into GF's design pursuant to Section 11.01.B.3. *See* R.R. at 2677a-2717a. Cummins opposed the motions in limine. *See* R.R. at 2760a-2806a.

On March 7, 2019, the trial court partially granted the Authority's motion in limine to exclude Hannon's opinions, stating that no expert shall give opinions regarding legal issues. *See* R.R. at 2819a-2820a. On the same date, the trial court deferred a ruling on the Authority's motion in limine concerning Contract interpretation, stating that "the [trial c]ourt is without sufficient evidence to consider the contract as a whole, which is a factor the [trial c]ourt must weigh in determining ambiguity." *See* R.R. at 2817a. The trial court further ruled that the matter "may be appropriately decided after a jury verdict through post-trial motions[.]" R.R. at 2818a.

The trial court conducted a jury trial from March 11 to 20, 2019. On March 15, 2019, at the end of Cummins' case-in-chief, the Authority moved for non-suit, arguing: (1) the Contract required judgment in the Authority's favor on all of Cummins' SBR-related claims because Cummins was solely responsible for identifying, modifying, making, and paying for all changes necessary to incorporate the Ashbrook SBR into GF's design; (2) the jury should not be permitted to decide, under the Commonwealth Procurement Code,[7] Cummins' bad faith claims related to the Authority's payments and the $260,000.00 it retained; and (3) certain of Cummins' extra work/change order claims were barred by the Contract's express terms. *See* R.R. at 4393a-4409a. Cummins opposed the motion. *See* R.R. at 4409a-4418a. The trial court denied the Authority's non-suit motion. *See* R.R. at 4418a.

---

[7] 62 Pa.C.S. §§ 101-2311.

Also, after Cummins' case-in-chief, and before commencement of the Authority's case-in-chief, the trial court denied the Authority's motion in limine concerning Contract interpretation, stating that the Contract, particularly Section 11.01.B.3 applicable to the SBR, was ambiguous as a matter of law. *See* R.R. at 2865a-2867a. The trial court explained:

> [] [The Authority] contends that [Section 11.01.B.3] is plain in its meaning and that a contractor is responsible for any and all changes to incorporate a contractor's item selections in [GF's] design. [Cummins] responds that while the contractor may suggest changes in its bid to afford the greatest savings to [the Authority], [GF] is ultimately responsible for ensuring that the project design is a functioning whole, at least in theory. Furthermore, [Cummins] contends that a contractor is bound to construct according to [GF's] design and has no discretion absent [GF's] or [the Authority's] approval.
>
> [] After considering the whole contract and recognizing the context of how public projects are bid and executed in practice, including how this project specifically transpired, it is apparent to the [trial c]ourt that a contractor's work is greatly informed, if not dictated, by the project engineer's design. Moreover, there is no apparent contract clause or mechanism that allows for a contractor to re-design how a portion of the project should be constructed (or for a contractor to construct *sua sponte*) to address a needed design change, even if a contractor identified design changes necessary to incorporate alternate equipment or items, as chosen by the contractor, that are in contradiction with the project engineer's basis of design. In light of these findings of fact surrounding the [C]ontract, the [trial c]ourt must determine that the [C]ontract is susceptible to more than one reasonable interpretation.

R.R. at 2866a-2867a. The Authority renewed its non-suit motion at the close of all of the evidence, which the trial court again denied. *See* R.R. at 5310a. Accordingly, the trial court permitted the jury to decide Cummins' contract-based claims. *See* R.R. at 5310a.

9

Over the Authority's objection, the trial court instructed the jury that it could interpret Section 11.01.B.3, explaining:

> [Cummins] and the [Authority] disagree about the meaning of some of [the] words and terms in the [C]ontract. Each party must prove that its interpretation is correct. When deciding which interpretation is correct, you should consider the following. The parties intent at the time they entered into the [C]ontract. The [C]ontract as a whole, so all parts make sense when read together. The parties' words and conduct after they entered into the [C]ontract. The words' plain and ordinary meaning unless you find that the parties intended the words to have another meaning, or if they are technical words, the meaning used by people in that trade or business. Whether the parties intended to exclude other similar items. Whether specific words or terms control general words or terms.
>
> . . . .
>
> If and only if you cannot determine what the parties intended the disputed words or terms to mean based upon the above considerations, then you may consider which party drafted the [C]ontract and interpret the language against that perianal [sic]. Again, this rule should be your last resort in determining which party's interpretation of the [C]ontract is correct. Notwithstanding, when a contract is clear and unequivocal, its meaning must be determined by its contents alone. The fundamental rule in interpreting the meaning of a [C]ontract is to ascertain and to give effect to the intent of the [C]ontract of the parties.

*See* R.R. at 5413a-5415a.

On March 21, 2019, the jury rendered a verdict in favor of Cummins in the amount of $488,243.24, consisting of the Contract balance that the Authority withheld, along with a number of Cummins' change order claims. *See* R.R. at 2868a-2876a. The jury also found that the Authority acted in bad faith in retaining the Contract balance. *See* R.R. at 2869a. In addition, the jury found against the Authority on 19 of its 20 counterclaims. *See* R.R. at 2873a-2874a.

10

**Facts**

On March 29, 2019, Cummins filed the Cummins Motion, therein seeking to have the trial court award the following additional amounts: (1) regular interest in the amount of $112,548.00; (2) penalty interest in the amount of $88,372.00; (3) attorney's fees and costs in the amount of $449,107.55; and (4) litigation expenses in the amount of $35,464.87. *See* R.R. at 2877a-2900a, 3056a-3264a. The Authority opposed Cummins' Motion. *See* R.R. at 2989a-3005a.

On April 1, 2019, the Authority filed the Authority Motion, *see* R.R. at 2901a-2988a, seeking judgment in its favor and against Cummins, claiming that the trial court improperly determined that the Contract was ambiguous and erred by allowing the jury to interpret the Contract provisions. *See* R.R. at 2946a-2960a. The Authority also asserted that the trial court erred by permitting the jury to decide Cummins' bad faith claim, *see* R.R. at 2960a-2965a, and extra work/change order claim. *See* R.R. at 2967a-2983a. Cummins opposed the Authority's Motion. *See* R.R. at 3006a-3055a.

On June 27, 2019, relative to Cummins' Motion, the trial court entered judgment upon the verdict for the amounts the jury awarded to Cummins, and awarded regular interest and some of Cummins' requested attorney's fees, but denied Cummins' request for penalty interest. *See* Authority Br. App. B. By separate June 27, 2019 order, the trial court denied the Authority's Motion.[8] *See* Authority Br. App. A.

On July 23, 2019, the Authority appealed to this Court.[9] *See* Pa. Cmwlth. No. 1000 C.D. 2019. On July 25, 2019, Cummins filed a cross-appeal in this Court. *See* Pa. Cmwlth. No. 1009 C.D. 2019. On July 29 and August 5, 2019,

---

[8] Notably, the trial court's order did not address the challenged change orders.

[9] Also, on July 23, 2019, the McKean County Prothonotary issued a Notice of Entry of Judgment against the Authority in the amount of $857,743.14. *See* R.R. at 5468a.

11

respectively, the trial court directed the parties to file Statements of Errors Complained of on Appeal pursuant to Pennsylvania Rule of Appellate Procedure (Rule) 1925(b) (1925(b) Statement). On August 16 and 23, 2019, respectively, the parties filed their Rule 1925(b) Statements. *See* R.R. at 5469a-5480a. On October 15, 2019, the trial court issued its opinion pursuant to Rule 1925(a) (1925(a) Opinion). *See* R.R. at 5481a-5527a. On October 21, 2019, this Court consolidated the appeals.[10] On January 3, 2020, the American Council of Engineering Companies of Pennsylvania and GF filed an Amici Curiae brief.

## Discussion

1. **Authority's Motion**

In its Motion, the Authority sought judgment notwithstanding the verdict (JNOV) or a new trial based on the trial court's interpretation that the Contract was ambiguous.

### a. SBR

The Authority argued that the trial court should have determined as a matter of law that the Contract placed sole responsibility on Cummins for defective system performance related to Cummins' Ashbrook SBR and, by failing to do so, the trial court erred by allowing the jury to interpret the Contract language based on extrinsic evidence.

"Under [this Court's] applicable standard of review, we will reverse a trial court's denial of a motion for JNOV or a new trial only if we find an abuse of discretion or an error of law that controlled the outcome of the case." *Walnut St. Assocs., Inc. v. Brokerage Concepts, Inc.*, 982 A.2d 94, 97 (Pa. Super. 2009), *aff'd*,

---

[10] The Authority is the designated appellant.

12

20 A.3d 468 (Pa. 2011). The crux of the Authority's appeal is that the trial court improperly determined that the Contract was ambiguous. "[T]he question of whether a contract is ambiguous is a question of law." *Kripp v. Kripp*, 849 A.2d 1159, 1164 n.5 (Pa. 2004); *see also PBS Coals, Inc. v. Dep't of Transp.*, 206 A.3d 1201 (Pa. Cmwlth. 2019).[11] "When, as here, the issue raised on appeal presents a question of law, [this Court's] standard of review is *de novo* and our scope of review is plenary." *Walnut St. Assocs., Inc.*, 982 A.2d at 97. "Thus, 'we need not defer to the conclusions of the trial court and are free to draw our own inferences.'" *PBS Coals, Inc.*, 206 A.3d at 1210 (quoting *Sw. Energy Prod. Co. v. Forest Res., LLC*, 83 A.3d 177, 187 (Pa. Super. 2013)).

> The Pennsylvania Supreme Court has explained:
>
> It is [] well established that under the law of contracts, in interpreting an agreement, the court must ascertain the intent of the parties.
>
> In cases of a written contract, the intent of the parties is the writing itself. If left undefined, the words of a contract are to be given their ordinary meaning. When the terms of a contract are clear and unambiguous, the intent of the parties is to be ascertained from the document itself. When, however, an ambiguity exists, parole evidence is admissible to explain or clarify or resolve the ambiguity, irrespective of whether the ambiguity is patent, created by the language of the instrument, or latent, created by extrinsic or collateral circumstances. A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. While unambiguous contracts are interpreted by the court as a matter of law, ambiguous writings are interpreted by the finder of fact.

*Kripp*, 849 A.2d at 1163 (citations omitted). "The fact that the parties do not agree upon the proper interpretation does not necessarily render the contract ambiguous."

---

[11] *Appeal granted in part*, 218 A.3d 373 (Pa. 2019) (Table).

*Parshall v. Parshall*, 560 A.2d 207, 211 (Pa. Super. 1989) (quoting *Vogel v. Berkley*, 511 A.2d 878, 881 (Pa. Super. 1986)).

Here, the trial court concluded that the "[C]ontract was ambiguous[,]" Trial Ct. June 27, 2019 Op. at 2 (R.R. at 5495a), based on "the [C]ontract clause most exemplary of the dispute,"[12] Trial Ct. June 27, 2019 Op. at 4 (R.R. at 5497a), Section 11.01.B.3, which stated:

> If products of manufacturers other than those named first differ from those named first in the Project Manual or on the [Contract] Drawings to the extent that their proper incorporation into the Work requires changes to the structural, piping, mechanical, electrical, instrumentation, or any other changes of whatsoever nature, the [c]ontractor shall be responsible for such changes.

Section 11.01.B.3 (R.R. at 137a). The parties do not dispute that ABJ Sanitaire was a manufacturer "*named first* in the Project Manual or on the [Contract] Drawings[,]" and that Ashbrook was a manufacturer "*other than* [*the one*] *named first* in the Project Manual or on the [Contract] Drawings." *Id*. (emphasis added). Therefore, Section 11.01.B.3 mandated that "to the extent that incorporation [of the Ashbrook SBR] into [GF's design] require[d] changes to the structur[e], piping, mechanic[s] . . . or any other changes whatsoever, [Cummins] shall be responsible for such changes." *Id*.

The parties also agree that changes were necessary to incorporate the Ashbrook SBR into GF's design because there were fundamental flow differences between the Ashbrook system and the ABJ Sanitaire system. Cummins presented

---

[12] Although the trial court added that Section 11.01.B.3 was "not the only [Contract] clause in dispute," Trial Ct. Op. at 4 (R.R. at 5497a), it was the *only* Contract clause the trial court analyzed in reaching its conclusion that the *entire* Contract was ambiguous. In its 1925(a) Opinion, the trial court stated: "[Section] 11.01.B.3 was the exemplary clause and was discussed in great detail in the [trial c]ourt's previous [o]rders[,] eliminating the need for reiteration [in the 1925(a) Opinion]." Trial Ct. 1925(a) Op. at 4-5 (R.R. at 5484a-5485a). Accordingly, this Court's review is likewise limited herein to Section 11.01.B.3.

changes to GF in the shop drawing submittal process and GF reviewed them. The dispute arose after the overflow problem. The parties disagreed about whether GF or Cummins was responsible for identifying that the 20-inch influent pipe in GF's design was undersized for the Ashbrook system. The Authority interpreted Section 11.01.B.3 to mean that Cummins was required to identify, make and pay for all changes necessary to incorporate the Ashbrook SBR into GF's design. Cummins interpreted Section 11.01.B.3 such that, although it was required to make and pay for changes necessary to incorporate its Ashbrook SBR, it was not liable for the overflow issues or the fix because GF was responsible during the shop drawing submittal process to ensure that the SBR system worked as a functioning whole, regardless of which SBR manufacturer was used.

Because this Court's review of whether the trial court erred turns on whether Section 11.01.B.3 is ambiguous, we must first examine the Contract to interpret the parties' intent.[13] The Contract consisted, *inter alia*, of the following Contract Documents: Instructions to Bidders, the Agreement, General Conditions, Contract Drawings, and SBR Specifications. *See* Section 15.01 of the Agreement (CONTRACT DOCUMENTS) (R.R. at 56a), Section 1.01.A.16 of the General Conditions (DEFINED TERMS/CONTRACT DOCUMENTS) (R.R. at 317a).

According to the Contract, as part of the bid process, Cummins made assurances that it carefully reviewed and understood the Work, including GF's basis of design as incorporated into GF's Contract Drawings and the SBR Specifications.[14]

---

[13] For clarity, this Court replaced Contract references to "OWNER" with "the Authority," references to "ENGINEER" with "GF," and references to "CONTRACTOR" with "Cummins."

[14] Section 1.01.A.42 of the General Conditions (DEFINED TERMS) defined "Specifications" as

> [t]hat part of the Contract Documents consisting of written technical descriptions of materials, equipment, systems, standards, and workmanship as applied to the Work, and certain administrative details applicable thereto. The arrangement, style and format of the

15

Section 11.01.B.1 of the Instructions to Bidders explained: "Products named on the Contract Drawings, if any, and **products of manufacturers named first** throughout the Project Manual[,] **constitute [GF's] design**." R.R. at 137a (emphasis added). Generally, Section 1.01 of the SBR Specifications summarized that "[t]he work specified . . . consists of providing the [SBR] equipment in the reinforced concrete SBR tanks **and all ancillary equipment and controls**." R.R. at 148a (emphasis added). Again, Section 1.03 of the SBR Specifications detailed the system description based on the ABJ Sanitaire SBR. *See* R.R. at 148a-150a. In Section 1.05 of the SBR Specifications, the Authority designated as "ACCEPTABLE MANUFACTURERS":[15]

> A.  ABJ Sanitaire
>
> B.  [Ashbrook]
>
> C.  Aqua Aerobics

---

Specifications is solely for convenience; and does not constitute segregation of the Work for subcontracts, products, or labor, nor does it control the extent of Work to be performed by any trade.

R.R. at 319a.

[15] Section 1.02.A.1 of the General Conditions (TERMINOLOGY) declared:

Whenever in the Contract Documents the terms 'as allowed,' 'as approved,' or terms of like effect or import are used, or the adjectives 'reasonable,' 'suitable,' 'acceptable,' 'proper,' 'satisfactory,' or adjectives of like effect or import are used to describe an action or determination of [GF] as to the Work, **it is intended that such action or determination will be solely to evaluate, in general, the completed Work for compliance with the requirements of and information in the Contract Documents and conformance with the design concept of the completed [P]roject as a functioning whole as shown or indicated in the Contract Documents**. The use of any such term or adjective **does not create any duty or authority by [GF] to supervise or direct the performance of the Work or any duty or authority to undertake responsibility contrary to . . . any other provision of the Contract Documents**.

R.R. at 321a (emphasis added).

R.R. at 152a.  However, Section 1.04.D of the SBR Specifications cautioned: "**The naming of a manufacturer in this Specification Section is not an indication that the manufacturer's standard equipment is acceptable in lieu of the specified component features**.  **Naming is only an indication that the manufacturer may have the capability of engineering and supplying a system as specified**."  R.R. at 151a (emphasis added).

Section 1.01 of the Agreement (WORK) represented: "[**Cummins**] **shall complete all Work as specified or indicated in the Contract Documents**.  The Work is generally described as follows: "[Cummins] shall at its sole expense furnish all labor, . . . materials, supplies, equipment, . . . **and all things necessary or proper for, and to perform all work necessary or incidental to, and perform all other obligations imposed by this Contract for** [**the Project**]."[16]  R.R. at 50a (emphasis added).

---

[16] Section 1.02 of the General Conditions (TERMINOLOGY) declared:

D.  Furnish, Install, Perform, and Provide:

1. The word 'furnish,' when used in connection with services, materials, or equipment, shall mean to supply and deliver said services, materials, equipment to the Site . . . ready for use or installation.

2. The word 'install,' when used in connection with services, materials, or equipment, shall mean to put into use including all necessary hook-ups, connections, and testing; and/or place in final position said services, materials, or equipment complete and ready for its intended use.

3. The words 'perform' or 'provide,' when used in connection with services, materials, or equipment, shall mean to furnish and install said services, materials, or equipment complete and ready for its intended use.

4. When 'furnish,' 'install,' 'perform,' or 'provide' is not used in connection with services, materials, or equipment in a context clearly requiring an obligation of [Cummins], 'provide' is implied.

Section 3.01 of the General Conditions (INTENT) declared, in relevant part:

A. The Contract Documents are complementary; what is called for by one is as binding as if called for by all.

B. It is the **intent of the Contract Documents to describe a functionally complete Project or part thereof, to be constructed in accordance with the Contract Documents**.

1. **Any labor**, documentation, **services, materials or equipment that may reasonably be inferred from the Contract Documents**, or from prevailing custom or trade usage as being required[17] **to produce the intended result, shall be provided, whether or not specifically called for, at no increase in the Contract [p]rice**.

. . . .

D.    [**Cummins**] **acknowledges that the Contract Drawings and Specifications are intended only to show the intent of the completed Project**.    [Cummins]

E. Unless stated otherwise in the Contract Documents, words or phrases which have a well-known technical or construction industry or trade meaning are used in the Contract Documents in accordance with such recognized meaning.

R.R. at 321a-322a.

[17] Section 9.10.I of the General Conditions (LIMITATIONS ON THE ENGINEER'S AUTHORITY AND RESPONSIBILITIES) declares:

**The words 'required', 'prescribed', 'directed', or 'ordered' by** [**GF**] or words of like import where used in these Contract Documents shall have the meaning only of interpreting the Contract Documents, directing notice to or attention of the materials, and finished results for conformity to and compliance with the Contract Drawings; and or **not intended or implied as any directions, instructions, or superintendence of** [**Cummins'**] **methods of construction; or use of equipment**, . . . ; **or acceptance of liability therefore** [sic]**; by** [**the Authority**] **or** [**GF**].

R.R. at 369a.

represents that it is qualified to construct the Work as depicted in the Contract Documents; **and to determine its own means, methods, techniques, sequences, and procedures**. To the extent that means, methods, techniques, sequences, and procedures are identified in the Contract Documents; [**Cummins**] **is required to independently evaluate those means, methods, techniques, sequences, and procedures for the purpose of determining whether the means, methods, techniques, sequences, and procedures depicted in the Contract Documents are adequate to construct the Work**. [Cummins] further represents that it **has based its bid upon its own determination** of the appropriate means, methods, techniques, sequences, and procedures required to construct the Contract Work.

R.R. at 324a-325a (emphasis added).

Accordingly, Section 4.06.A. of the Instructions to Bidders (EXAMINATION OF BIDDING DOCUMENTS AND THE SITE) also stated, in pertinent part:

Before submitting a Bid, it is the responsibility of each Bidder to do the following:

1. **Examine and carefully study the Bidding Documents**,[18] including any Addenda and the other related data identified in the Bidding Documents.

. . . .

4. Determine the means and methods the Bidder proposes to use to construct the Work consistent with the Contract Documents.

. . . .

9. **Correlate the information known to the Bidder**, information and observations obtained from visits to the Site, reports **and drawings identified in the Bidding Documents**, and all additional examinations, investigations,

---

[18] According to Section 1.01.A.5 of the General Conditions (DEFINED TERMS), the Bidding Documents consisted of: "The Bidding Requirements, proposed Contract Documents current at the time of the Bid, **Resource Drawings**, and all Addenda issued prior to opening of Bids." R.R. at 316a (emphasis added).

explorations, tests, studies, and data **with the Bidding Documents**.

. . . .

11. **Promptly give [GF] written notice of all conflicts, errors, ambiguities, or discrepancies that the Bidder discovers in the Bidding Documents**; and confirm that the written resolution thereof by [GF] is acceptable to Bidder.

12. Determine that the Bidding Documents are generally sufficient to indicate and convey an understanding of all terms and conditions for the performance of the Work.

R.R. at 132a-133a (emphasis added); *see also* Section 4.10.A of the Instructions to Bidders (ADEQUACY OF BIDDING DOCUMENTS), R.R. at 134a. Section 7.01 of the Instructions to Bidders (QUESTIONS, INTERPRETATIONS, AND CLARIFICATIONS) reiterated that "[a]ll questions about the meaning or intent of the Bidding Documents shall be submitted to [GF] in writing . . . ." R.R. at 135a.

By signing the Agreement, Cummins repeated its understanding. Section 7.01 of the Agreement (CONTRACTOR REPRESENTATIONS) provided, in relevant part:

In order to induce [the Authority] to enter into this Agreement[,] [Cummins] makes the following representations:

A. [**Cummins**] **has examined and carefully studied the Contract Documents and the other related data** identified in the Bidding Documents.

. . . .

G. [**Cummins**] **has correlated the information** known to [Cummins], information and observations obtain[ed] from visits to the Site, reports **and drawings** identified in the Contract Documents, and all additional examinations, investigations, explorations, tests, studies, and data **with the Contract Documents**.

> H. [**Cummins**] **has given** [**GF**] **written notice of all conflicts, errors, ambiguities, or discrepancies** that [Cummins] has discovered in the Contract Documents, and the written resolution thereof by [GF] is acceptable to [Cummins].
>
> I. **The Contract Documents are generally sufficient to indicate and convey** [**an**] **understanding of all terms and conditions for performance and furnishing of the Work**.

R.R. at 54a (emphasis added).

Moreover, Section 2.05.A.1 of the General Conditions (BEFORE STARTING CONSTRUCTION) (General Conditions (BEFORE)), required: "Before undertaking each part of the Work, [**Cummins**] **shall carefully study and compare the Contract Documents and check and verify pertinent figures therein and apply all field measurements**." R.R. at 323a (emphasis added). Section 2.05.C of the General Conditions (BEFORE) repeated: "[Cummins] shall promptly report in writing to [GF] any conflict, error, ambiguity, or discrepancy which [Cummins] may discover; and shall obtain a written interpretation or clarification from [GF] before proceeding with the Work affected thereby." R.R. at 323a.

In Section 6.20 of the General Conditions (CONTRACTOR'S REVIEW OF CONTRACT DOCUMENTS), Cummins again agreed:

> A. Submission of a Bid and/or **execution of the Agreement by** [**Cummins**] **is a representation that** [**Cummins**] **has thoroughly reviewed and evaluated the Contract Documents to determine whether** [**Cummins**] **needs clarification** of the Contract Documents or additional interpretation of the intent of the Contract Documents to determine its Bid, and that it has requested any needed clarification prior to submitting its [B]id.
>
> B. [**Cummins**] **represents that it has the knowledge, skill, and expertise to perform the Work; that it understands that it must make reasonable inferences to determine portions of the Work not shown in the Contract Documents that would be required for a proper and complete Project**, and it has included all costs

21

for such inferences in its Bid; and, that [**Cummins**] **is not relying on representations the Contract Documents or by [the Authority] or [GF] for the purpose of determining the cost, means, methods, sequences, or procedures of performing the Work**.

R.R. at 359a-360a (emphasis added).

By bidding with the Ashbrook SBR and entering into the Contract, Cummins also understood and guaranteed its work in accordance with the Contract Documents. Article 6 of the General Conditions (CONTRACTOR RESPONSIBILITIES), in Section 6.01.A thereof directed that "[**Cummins**] **shall be solely responsible for the means, methods, techniques, sequences, and procedures of construction**[,]" and "[**Cummins**] **shall be responsible to see that the completed Work complies accurately with the Contract Documents**." R.R. at 341a (emphasis added). According to Section 6.03.A: "Unless otherwise specified in the General Requirements, [**Cummins**] **shall provide and assume full responsibility for all services, materials, equipment, labor** . . . **and all other facilities and incidentals necessary for the performance, testing, start up, and completion of the Work**." R.R. at 341a (emphasis added). By Section 6.19.A of the General Conditions (CONTRACTOR'S GENERAL WARRANTY AND GUARANTEE), **Cummins** "**warrant**[**ed**] **and guarantee**[**d**] to [the Authority] and [GF] . . . **that all Work, materials, equipment, and other Contract performances shall be in accordance with the Contract Documents** . . . ." R.R. at 358a (emphasis added).

In Section 10.01 of the Agreement (CONTRACTOR SHALL GUARANTEE THE WORK), Cummins agreed:

> [**Cummins**] **shall guarantee its work, material and equipment and the other Contract performances, and shall remedy, without cost to [the Authority], any defects which may develop** therein during a period of one (1) year from the date of the [Authority's] acceptance of the Certificate of Substantial Completion issued by [GF].

22

R.R. at 55a (emphasis added).

Finally, under the Contract, GF's review of Cummins' shop drawings did not shift liability for the Ashbrook system's functionality to GF. Notably, Section 1.01.A.17.a of the General Conditions declared: "**Shop drawings and other [Cummins'] submittals are not Contract Documents as so defined**." R.R. at 317a (emphasis added); *see also* Section 1.01.A.40 of the General Conditions (R.R. at 319a). Section 6.17.B.2 of the General Conditions (SUBMITTALS) provided:

> The data shown in [**Cummins'**] [s]hop [d]**rawings shall be complete with respect to quantities, dimensions, specified performance and design criteria**, materials and similar data to show [GF] the services, materials and equipment [Cummins] proposes to provide, and **to enable [GF] to review the information for the limited purposes set forth in Subparagraph 6.17.F**.

R.R. at 356a (emphasis added). According to Section 6.17.E.2 of the General Conditions, "[b]efore submitting each [s]hop [d]rawing, . . . [**Cummins**] **shall have determined and verified** . . . [**a**]**ll** . . . **quantities, dimensions, specified performance criteria, installation requirements, materials,** . . . **and similar information** with respect thereto[,]" R.R. at 356a (emphasis added), "**shall have reviewed and coordinated each** [s]hop [d]**rawing** . . . **or other submittal** . . . **with the requirements of the Work and the Contract Documents**[,]" and shall have supplied written verification that it satisfied those obligations. R.R. at 357a (emphasis added).

Section 6.17.E.4.a of the General Conditions further specifies that, "[a]t the time of each submittal, [**Cummins**] **shall give** [**GF**] **specific written notice if any** [s]hop [d]**rawing** . . . **or other submittal** [] **deviates from the requirements of the Contract Documents**," which notice is separate from the submittal, **plus** "[**Cummins**] **shall cause a specific notation to be made on each** [s]hop [d]rawing .

23

. . or other submittal." R.R. at 357a (emphasis added). Notwithstanding, according to Section 6.17.E.5:

> **[Cummins'] obligations are not changed by an approval of any [s]hop [d]rawing** or other submittal.
>
> a. If [**Cummins**] **intends that a change to the Contract be made by any information in a [s]hop [d]rawing, it shall affirmatively state** that the [s]hop [d]rawing depicts a change in the Work, **and submit a written notice** in accordance with the procedure in Subparagraph 6.17.E.4.
>
> b. Notations, marks, or other comments by [GF] on a submittal . . . do not change the Contract Documents.

R.R. at 357a (emphasis added).

Regarding GF's review of shop drawings and submittals, Section 6.17.F of the General Conditions prescribed that, even if GF had "approved" Cummins' shop drawings:

> 1. [**GF's**] **review and approval of [s]hop [d]rawings . . . and other submittals will be only for general conformance to the information given in the Contract Documents and compatibility with the design concept of the completed Project as a functioning whole as indicated by the Contract Documents**.
>
> . . . .
>
> b. [GF's] review and approval **shall not extend to the means, methods, techniques, sequences, or procedures of construction** . . . .
>
> c. The review and approval of a separate item as such **will not indicate approval of the assembly in which the item functions**.
>
> 2. [**GF's**] **review and approval of [s]hop [d]rawings or other submittals shall not relieve [Cummins] from responsibility for any variation from the requirements of the Contract Documents**.

24

R.R. at 357a-358a (emphasis added).

Section 6.19.C of the General Conditions (CONTRACTOR'S GENERAL WARRANTY AND GUARANTEE) stated:

> [**Cummins'**] **obligation to perform and complete the Work in accordance with the Contract Documents shall be absolute; none of the following shall constitute an acceptance of Work, materials, equipment, or other Contract performances that are not in accordance with the Contract Documents**, or a release of [Cummins'] warranty or guarantee or obligation to perform the Work in accordance with the Contract Documents:
>
> 1.    Observations by [GF].
>
> 2.    Recommendation by [GF] or payment by [the Authority] of any progress or final payment.
>
> 3.    The issuance of a [C]ertificate of Substantial Completion by [GF] or any payment related thereto by [the Authority].
>
> . . . .
>
> 6. **Any review and approval of a** [s]**hop** [d]**rawing or** [s]**ample submittal, or the issuance of a notice of acceptability by** [**GF**].

R.R. at 359a (emphasis added).

Consequently, if Ashbrook failed to take into account the hydraulics and the influent piping size for the SBR system, the Contract made Cummins responsible therefor. Section 6.06.D of the General Conditions (CONCERNING SUPPLIERS AND OTHERS), specified: "[**Cummins**] **shall be fully responsible to** [**the Authority**] **and** [**GF**] **for all acts and omissions of the** . . . [s]**uppliers**, and other individuals or entities performing or furnishing any of the Work just as [Cummins] is responsible for [its] acts and omissions." R.R. at 348a (emphasis added).

According to Section 9.10.C of the General Conditions (LIMITATIONS ON THE ENGINEER'S AUTHORITY AND RESPONSIBILITIES), "[**GF**] **will not be responsible**

25

**for [Cummins'] failure to perform the Work in accordance with the Contract Documents**." R.R. at 368a (emphasis added). Section 9.10.D thereof stated: "**[GF] shall not be responsible for the acts or omissions of [Cummins], or of any** . . . **[s]upplier, or any other individual or entity performing the Work**."[19] R.R. at 368a (emphasis added).

Contrary to Cummins' position, the Authority's naming of Ashbrook as an additional manufacturer did not make the Ashbrook SBR interchangeable with the ABJ Sanitaire SBR around which the Project was designed. Nor did the Contract Documents make any tacit guarantee that the Ashbrook SBR would fit and function without design changes. Rather, this Court has explained:

> It is well settled that where the government orders a structure to be built, and in so doing prepares the project's specifications prescribing the character, dimension, and location of the construction work, the government implicitly warrants, nothing else appearing, that if the specifications are complied with, satisfactory performance will result.
>
> If [a] court finds the cause of faulty construction to be a deficiency in a design specification the government would bear the risk, and consequently be liable for reasonable costs incurred by the plaintiff. Defective design specifications may entitle a contractor to an equitable adjustment of the contract for the reparative work required to build a satisfactory end-product.

---

[19] In fact, Section 9.10.H General Conditions (LIMITATIONS ON THE ENGINEER'S AUTHORITY AND RESPONSIBILITIES) provided:

> [GF] makes no representations or warranties to [Cummins], or [its] . . . [s]uppliers . . . regarding the completeness, accuracy, the suitability of any means or methods shown, or fitness of use of the plans, estimates and Contract Documents; or that the Work can be performed or constructed using normal and reasonable construction methods.

R.R. at 368a.

> *But not all contract specifications are design specifications - some are merely performance specifications:*

>> Design specifications explicitly state how the contract is to be performed and permit no deviations. *Performance specifications, on the other hand, specify the results to be obtained, and leave it to the contractor to determine how to achieve those results.*

>> *The government does not implicitly warrant performance specifications for complete accuracy or adequacy.* **Typical performance type specifications set forth an objective or standard to be achieved, and the successful bidder is expected to exercise his ingenuity in achieving that objective or standard of performance, selecting the means and assuming a corresponding responsibility for that selection.**

*A.G. Cullen Constr., Inc. v. State Sys. of Higher Educ.*, 898 A.2d 1145, 1157 (Pa. Cmwlth. 2006) (bold emphasis added), *disapproved of on other grounds by A. Scott Enters., Inc. v. City of Allentown*, 142 A.3d 779 (Pa. 2016) (quoting *George Sollitt Constr. Co. v. United States*, 64 Fed. Cl. 229, 296-97 (2005) (emphasis added) (citations and quotations omitted)).

> This Court expounded:

>> In order to differentiate between design and performance specifications, courts examine the level of discretion that exists within a given specification; 'discretion serves as the touchstone for assessing the extent of implied warranty and intended liability.' *Conner Bros. Constr. Co., Inc. v. U[.]S[.]*, 65 Fed. Cl. 657, 685 (2005). A contractor claiming a particular specification is 'design' rather than 'performance' must establish the specification 'do[es] not permit meaningful discretion . . . and the defective specification [is] the cause of [the] injury.' *Id.*

>> Of particular import here, the mere identification of a product or manufacturer does not create a design specification. **Where a government agency identifies a**

27

> particular product or manufacturer by name, but
> **permits substitution of 'an approved equal,' such a
> specification is 'performance' in nature and, as a result,
> carries no implied warranty**. *See W.G. Yates & Sons
> Constr. Co., Inc. v. United States*, 53 Fed. Cl. 83 (2002);
> *Florida Bd. of Regents v. Mycon Corp.*, 651 So.2d 149 (Fla.
> Dist. Ct. App. 1995). *See also* Philip L. Bruner and Patrick
> J. O'Connor, Jr., 3 *Bruner & O'Connor on Constr*[.] *Law* §
> 9:93 (2005).

*A.G. Cullen Constr., Inc.*, 898 A.2d at 1157 (emphasis added).

"A contract is not ambiguous if the court can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends[.]" *State Highway & Bridge Auth. v. E. J. Albrecht Co.*, 430 A.2d 328, 330 (Pa. Cmwlth. 1981) (quoting 8 P.L.E. Contracts § 146 (1971)). Here, based solely on the Contract language, the meaning of Section 11.01.B.3 is clear. Because Cummins' bid offered an SBR other than that for which GF prepared the Contract Drawings, Cummins was at all times solely responsible for incorporating the Ashbrook SBR as specified in the Contract Documents. In that context, Section 11.01.B.3 mandated: "[**T**]**o the extent that** [**the Ashbrook SBR's**] **proper incorporation into the Work require**[**d**] **changes to the structural, piping, mechanical**, electrical, instrumentation, **or any other changes of whatsoever nature**, [**Cummins was**] **responsible** for" exercising its (or Ashbrook's) ingenuity anticipating and identifying changes necessary to make the Ashbrook SBR *and* the connecting systems work as required by the Contract Documents, designing or *at the very least* making GF aware of such changes and/or working with GF to incorporate them, and ultimately guaranteeing an operational SBR system in accordance with the Contract Documents, all at Cummins' expense. Section 11.01.B.3 (R.R. at 137a) (emphasis added). The Contract expressly shifted to the contractor the responsibility and risk for "changes of whatsoever nature," Section

28

11.01.B.3, for a contractor to incorporate a different SBR and/or equipment into GF's design.[20] Thus, this Court concludes that Section 11.01.B.3 is not ambiguous.

To the extent that Section 11.01.B.3 was "the [C]ontract clause most exemplary of the dispute," Trial Ct. June 27, 2019 Op. at 4 (R.R. at 5497a), and this Court has ruled, based upon its extensive review of the Contract Documents, that Section 11.01.B.3 is not ambiguous, the trial court erred by concluding that the *entire* Contract was ambiguous. The trial court should have determined as a matter of law, *before* allowing Cummins to proceed with its case-in-chief and relying on Cummins' evidence to reach its conclusion, that the Contract placed sole responsibility on Cummins for defective system performance related to its Ashbrook SBR.[21] By failing to do so, the trial court erred by allowing the jury to interpret the Contract language based on extrinsic evidence. Accordingly, the trial court's June 27, 2019 order denying the Authority's Motion must be reversed.

### b. Change Orders/Extra Work

The Authority also argues that the trial court erred as a matter of law and abused its discretion by allowing the jury to decide Cummins' claims for certain

---

[20] Otherwise, the Authority and, by extension, the public would have borne the cost to have GF design in advance for at least three potential SBRs and the myriad of configurations and connectivity that a bidder may have included in its bid. Because the Contract did not expressly prohibit bids proposing SBRs other than the ABJ Sanitaire, Ashbrook and Aqua Aerobics, based on Cummins' logic, the Authority would have to have paid GF to design the system to accommodate the configuration and operability of every potential SBR system. Cummins' interpretation was not intended in the Contract, and is against public policy, as it would not protect taxpayer funds. *Hanisco*.

[21] In light of this Court's holding that Section 11.01.B.3 is unambiguous, the Authority's interpretation of Section 11.01.B.3 was reasonable. Therefore, the Authority's withholding of the Contract balance due to its belief that Cummins was contractually responsible for the gate overflows was not in bad faith. Accordingly, this Court need not further analyze that issue in this appeal.

change orders when those claims were barred by the Contract terms and undisputed evidence.

In its Motion, the Authority claimed:

12. For the same reason, the [trial c]ourt erred in failing to enter judgment on liability for [the Authority] on [the Authority's] own SBR-related claims. Because [Section] 11.01[.]B imposed sole contractual responsibility on [Cummins], [Cummins] was liable for [the Authority's] SBR-related damages.

13. In addition, the [trial c]ourt erred as a matter of law in permitting the jury to decide [Cummins'] extra work claims relating to survey and control (No. 1), re-routing the sewer line (No. 3), removal and replacement of the roof of the UV plant to install the UV equipment (No. 19), and topsoil (No. 58) because the Contract Documents barred those claims based on [Cummins'] prior execution of change orders. (Ex. D-2 at pp. 186-187) ([Project Manual (]PM[)], [General Conditions (]GC[)], 00700-64/65 at Art. 12.01(E), (F))[.]

14. The [trial c]ourt erred as a matter of law in allowing the jury to decide [Cummins'] extra work claim related to communication (No. 30) as [Cummins] bore sole contractual responsibility for the work described in the claim. (Ex. P-3) (Agreement, Art. 1.01, 4.04(A), (B), 9.01); (Ex. D-2) (PM, GC, 00700 at Art. 6.01(A); GC, 00700 at Art. 6.03(A); GC, 00700 at Art. 6.06(E); GC, 00700 at Art. 6.13(A), (D), (E); GC, 00700 at Art. 6.19(C); GC, 00700 at Art. 7.02(A); GC, 00700 at Art. 8.08(A))[.]

15. The [trial c]ourt erred as a matter of law in allowing the jury to decide [Cummins'] extra work claims relating to painting (Nos. 111-115) and additional painting because the contract required [Cummins] to paint the exposed interior concrete and masonry walls in Headworks No. 2 and because [Cummins'] execution of change orders relating to painting pipes barred [Cummins'] request for additional compensation. (Ex. P-3) (Agreement, Art. 1.01(A)); (Ex. D-2) (PM, § 01311 [] ¶1.03(D)(2)(g); § 09900 [] ¶¶1.09(B), 2.02(E)(1), (2), 3.02(J), 3.09(B), (C); GC, 00700 at Art. 3.01(A); GC, 00700 at Art. 12.01(E), (F))[.]

16. The [trial c]ourt erred as a matter of law in failing to enter judgment for [the Authority] and in allowing the jury to decide [Cummins'] extra work claim relating to [Cummins'] pump entering the bar screen in Headworks No. 1 (No. 41) because the Contract imposed sole liability on [Cummins] for [Cummins'] use of its own equipment and any damage associated with that use. (Ex. P-3) (Agreement, Art. 9.01); (Ex. D-2) (PM, GC, 00700 at Art. 6.13(A), (D), (E); GC, 00700 at Art. 6.21(A))[.]

17. The [trial c]ourt erred as a matter of law in failing to enter judgment for [the Authority] and in allowing the jury to decide [Cummins'] extra work claim relating to the SBR blower repair costs (Nos. 109, 116, 119, 120, 121) because the Contract Documents imposed all liability on [Cummins] for damage to equipment and because [Cummins] already paid for that damage. (Ex. D-2) (PM, GC, 00700 at Art. 6.11(A), (B)(1)(a); GC, 00700 at Art. 10.05(A)(1), (F); GC, 00700 at Art. 12.01(G); § 01660 [] ¶¶1.02(A), 1.07)[.]

18. The [trial c]ourt erred as a matter of law in failing to enter judgment for [the Authority] and in allowing the jury to decide [Cummins'] claim for consequential damages based on the sale of Florida real estate. [The Authority] filed a pretrial motion *in limine* to preclude that evidence and also sought judgment in its Nonsuit Motions. [Cummins] argued that it was entitled to several hundred thousand dollars, which sale was necessary (according to Bob Cummins) as a result of the failure to release the Contract balance. The jury initially awarded $75,000 on the verdict sheet and then changed its verdict to $0. However, that evidence reinforced [Cummins'] claim to the jury that he was severely harmed by the non-release of the contract balance and affected the outcome on both the bad faith claim and the extra work claims, as evidenced by the jury's initial award of consequential damages. The evidence also did not support a finding that [the Authority's] withholding of the Contract balance was the factual cause of the sale inasmuch as [Cummins] acknowledged that he had another major financial hardship relating to the East Branch Dam project and purchasing equipment for his newly-formed concrete company.

Authority Motion at 5-6 (R.R. at 2906a-2907a).

The trial court did not specifically address or mention its interpretation of any Contract change order or extra work provisions or any ambiguity related thereto in its June 27, 2019 order denying the Authority's Motion. In its 1925(a) Opinion, the trial court merely stated:

> [The Authority's] Twelfth, Thirteenth, Fourteenth, Fifteenth, Sixteenth, Seventeenth, and Eighteenth points of appeal are again all based upon contract interpretation. [This trial c]ourt has ruled that the [C]ontract was ambiguous and it can reasonably be inferred from the [j]ury's verdict that [it] agreed. [The Authority's] arguments must now fail as they have before.

Trial Ct. 1925(a) Op. at 9 (R.R. at 5489a). Because the trial court's only basis for denying the Authority's Motion relative to the change order and extra work claims was that the Contract was ambiguous, and this Court has ruled that the Contract was *not* ambiguous, the trial court's June 27, 2019 order denying the Authority's Motion must be reversed.

### 2. Cummins' Motion

In light of this Court's ruling that the trial court erred by denying the Authority's Motion, and allowing the matter to proceed to a jury trial on the basis of contract ambiguity, the trial court's order granting in part and denying in part Cummins' Motion to mold the jury's verdict for interest, penalty interest and attorney's fees is moot and must be vacated.

### Conclusion

Based on the foregoing, the trial court's June 27, 2019 order denying the Authority's Motion seeking JNOV or a new trial is reversed, and this matter is remanded for the trial court to determine whether, in light of this Court's ruling, any issues remain. If there remain no outstanding issues, then the trial court is to grant

the Authority's Motion for JNOV; however, if there are outstanding issues, then the trial court is to grant the Authority's Motion for a new trial. The trial court's June 27, 2019 order denying in part Cummins' Motion is vacated.

_____
ANNE E. COVEY, Judge

Robert J. Cummins, d/b/a Bob :
Cummins Construction Company :
                              :
          v. :
                              :
Bradford Sanitary Authority, : No. 1000 C.D. 2019
               Appellant :
                              :
Robert J. Cummins, d/b/a Bob :
Cummins Construction Company, :
               Appellant :
                              :
          v. :
                              : No. 1009 C.D. 2019
Bradford Sanitary Authority :

## O R D E R

AND NOW, this 8th day of June, 2020, the McKean County Common Pleas Court's (trial court) June 27, 2019 order denying the Bradford Sanitary Authority's (Authority) Motion for Post-trial Relief is REVERSED, and this matter is REMANDED to the trial court to determine whether, in light of this Court's ruling, the Authority shall be granted a judgment notwithstanding the verdict or a new trial.

The trial court's June 27, 2019 order denying in part Robert J. Cummins d/b/a Bob Cummins Construction Company's Motion to Mold the Verdict for Interest, Penalty Interest and Attorney's Fees is VACATED.

Jurisdiction is relinquished.

_____
ANNE E. COVEY, Judge